[No. 1382-1.   Division One.   December 10, 1973.]

GREG MORRIS et al., Respondents, v. SEATTLE-FIRST NATIONAL BANK et al., Appellants.

CALLOW, J., concurs by separate opinion.

*Anderson, Hunter, Carlson & Dewell* and *Julian C. Dewell,* for appellants.

*Cooper & Lyderson* and *Donald J. Lyderson,* for respondents.

FARRIS, J.—Seattle-First National Bank appeals from a judgment in the amount of $2,700 for conversion of a car owned by GM Auto Sales.

On January 3, 1968, First State Bank of Abilene, Texas, financed a 1968 Ford LTD for Edward Valick, taking a security interest on that vehicle. Thereafter, the State of Texas issued a certificate of title showing First State Bank as lienholder. In April 1968, Valick advised First State Bank that he would be spending several months in New York and asked the bank's permission to obtain New York license plates. First State Bank gave Valick a letter dated April 29, 1968, allowing him to license the vehicle in the state of New York with the understanding that "we will not need to relinquish our Texas title for this purpose." Valick then drove to New York, there procuring a New York title certificate which did not show the existence of any liens.

On about May 31, 1968, Valick offered to sell the LTD to GM Auto Sales. On June 3, the parties settled on a price conditioned on Valick's obtaining a Washington title certificate. Valick then drove to Olympia and procured title

solely in his own name, whereupon GM Auto Sales purchased the vehicle for $2,625.

At that time the loan payments due to First State Bank were delinquent and that bank did not know the whereabouts of either Valick or the automobile. Then, on June 1, 1968, Valick advised First State Bank that he was in Everett, Washington, and forwarded a payment of $593.27. Within a month the loan had again become delinquent. First State Bank contacted Seattle-First National Bank with the request that Sea-First, as First State Bank's special agent, repossess the car as was authorized under the terms of the loan agreement between First State Bank and Valick.

GM Auto Sales sent the car to Klein Motors for transmission work on about July 8, 1968. Although the sale from Valick to GM Auto Sales was completed, the title was still in Valick's name and he signed the repair order at the request of GM Auto Sales. Sea-First demanded the return of the car. When this demand was refused, Sea-First repossessed it while it was still at Klein Motors. GM Auto Sales, whose name did not appear on the title either as owner or lienholder, demanded the car's return; Sea-First refused. This action followed. The trial court granted a judgment of $2,700 against Sea-First for conversion of the car on the theory that the letter from First State Bank allowing the New York registration was a waiver by that bank of its rights under RCW 62A.9-103(3) to perfect its security interest in Washington. We reverse.

Sea-First, acting as agent for First State Bank of Abilene, could lawfully repossess the car as authorized under the security agreement unless GM Auto Sales gained an interest superior to that of First State Bank of Abilene by its purchase of the car from Valick.

Texas law governs the initial perfection of First State Bank's security interest. The car was purchased in Texas, the execution of the contract and the initial titling of the car were in Texas, and buyer Valick was a Texas resident.

*See* RCW 46.12.095(3)(a), (b).[1] The trial court properly held that First State Bank had satisfied all of the statutory requirements in perfecting its security interest in Texas.

Under RCW 62A.9-103(3) a secured party has 4 months to locate its property and perfect its security interest in Washington following the property's removal to Washington from a state in which the security interest was previously perfected.

> If the security interest was already perfected under the law of the jurisdiction where the property was when the security interest attached and before being brought into this state, the security interest continues perfected in this state for four months and also thereafter if within the four month period it is perfected in this state.

RCW 62A.9-103(3).

Regardless of whether it perfected its security interest in compliance with Washington law, First State Bank's security interest therefore continued under RCW 62A.9-103(3), to be perfected in Washington for the first 4 months after the car was brought into this state. Valick left Texas no earlier than April 29, 1968, the date of the letter from First State Bank which authorized him to license the car in New York. First State Bank's security interest continued to be perfected in Washington until at least July 29, 1968, 4 months from that date. Therefore, when First State Bank repossessed the car on or about July 8, 1968, through its

---

[1] "(3) If a vehicle is subject to a security interest when brought into this state, perfection of the security interest is determined by the law of the jurisdiction where the vehicle was when the security interest was attached, subject to the following:

"(a) If the security interest was perfected under the law of the jurisdiction where the vehicle was when the security interest was attached, the following rules apply:

"(b) If the name of the secured party is shown on the existing certificate of ownership issued by that jurisdiction, the security interest continues perfected in this state. The name of the secured party shall be shown on the certificate of ownership issued for the vehicle by this state. The security interest continues perfected in this state upon the issuance of such ownership certificate."

agent Sea-First, First State Bank's security interest continued to have priority.

Reversed.

WILLIAMS, J., concurs.

CALLOW, J. (concurring)—The security interest of the First State Bank of Abilene, Texas, was perfected under Texas law initially. Thereafter, the Texas bank gave the owner limited written permission to license the vehicle in New York so long as the bank did not need to relinquish its Texas title. The owner secured a New York registration which did not show the interest of the Texas bank. GM Auto Sales was aware that the owner had a New York title on the vehicle and refused to accept it. On June 3, 1968, the owner had issued to him a Washington State title showing himself as the legal owner without any lien interest in any third party being reflected on the certificate. He accomplished this by taking the New York license plates from the automobile to the Motor Vehicle License Department in Olympia, presumably by using the New York State title which did not reflect the lien interest of the Texas bank and by not disclosing the lien interest of the Texas bank when he applied for the Washington title.[2]

The issue raised is whether under the Uniform Commercial Code and RCW 46.12 the secured party or the bona fide purchaser should suffer. In essence, the inquiry is whether the burden should be upon the secured party to keep his interest unimpaired or upon the purchaser to inquire as to the absence of out-of-state liens.

The following statutes are before us. RCW 62A.9-103 states in part:

(3) If personal property other than that governed by subsections (1) and (2) is already subject to a security interest when it is brought into this state, the validity of the security interest in this state is to be determined by

_____

[2]The Washington State Department of Motor Vehicles does not run a check to discover whether liens against vehicles exist in other states but relies upon the verified application of the applicant.

the law (including the conflict of laws rules) of the jurisdiction where the property was when the security interest attached. However, if the parties to the transaction understood at the time that the security interest attached that the property would be kept in this state and it was brought into this state within 30 days after the security interest attached for purposes other than transportation through this state, then the validity of the security interest in this state is to be determined by the law of this state. If the security interest was already perfected under the law of the jurisdiction where the property was when the security interest attached and before being brought into this state, the security interest continues perfected in this state for four months and also thereafter if within the four month period it is perfected in this state. The security interest may also be perfected in this state after the expiration of the four month period; in such case perfection dates from the time of perfection in this state. If the security interest was not perfected under the law of the jurisdiction where the property was when the security interest attached and before being brought into this state, it may be perfected in this state; in such case perfection dates from the time of perfection in this state.

(4) Notwithstanding subsections (2) and (3), if personal property is covered by a certificate of title issued under a statute of this state or any other jurisdiction which requires indication on a certificate of title of any security interest in the property as a condition of perfection, then the perfection is governed by the law of the jurisdiction which issued the certificate.

Continuing, RCW 62A.9-302 states in part:

(3) The filing provisions of this Article do not apply to a security interest in property subject to a statute

. . .

(b) of this state which provides for central filing of, or which requires indication on a certificate of title of, such security interests in such property.

(4) A security interest in property covered by a statute described in subsection (3) can be perfected only by registration or filing under that statute or by indication of the security interest on a certificate of title or a duplicate thereof by a public official.

and RCW 46.12.095 states in part:

A security interest in a vehicle other than one held as inventory by a manufacturer or a dealer and for which a certificate of ownership is required is perfected only by compliance with the requirements of this section:

. . .

(3) If a vehicle is subject to a security interest when brought into this state, perfection of the security interest is determined by the law of the jurisdiction where the vehicle was when the security interest was attached, subject to the following:

(a) If the security interest was perfected under the law of the jurisdiction where the vehicle was when the security interest was attached, the following rules apply:

(b) If the name of the secured party is shown on the existing certificate of ownership issued by that jurisdiction, the security interest continues perfected in this state. The name of the secured party shall be shown on the certificate of ownership issued for the vehicle by this state. The security interest continues perfected in this state upon the issuance of such ownership certificate.

The state of the record leaves something to be desired regarding proof of Texas and New York law. There is testimony that the interest of a lienholder would not be reflected on a New York title. The Texas certificate of title was admitted into evidence and did reflect the lien interest of the First State Bank of Abilene, Texas. It appears that New York is a nontitle state while Texas is a certificate of title state. However, neither the law of Texas nor New York was set forth in any pleading.

Left with the less than a satisfactory situation as to the proof of the foreign law involved, an analysis of the problem can only be made with the tools available. In J. White & R. Summers, *Handbook of the Law Under the Uniform Commercial Code* § 23-21 (1972), it was said at page 857:

*Noncertificate—Certificate*

When the automobile moves from a noncertificate of title state to a state which issues a certificate, the courts have split on the applicability of 9-103 (4). About half the courts have decided that subsection (4) was not intended to apply when the first jurisdiction had no applicable certificate of title law. These courts have relied primarily

on the alleged policy of subsection (4) to avoid duplication of certificate of title notation. Where the first state does not require the security interest to be noted upon the certificate, no duplication can occur, therefore, so the argument goes, subsection (4) is inapplicable. These courts apply subsection (3) so that the secured party is continuously perfected for four months, despite the existence of a clean local certificate which could mislead local creditors and buyers.

In our judgment the conflicting view which applies subsection (4) is better law. Such a policy recognizes the certificate of title in the new state as the exclusive means of perfection and minimizes the possibility of misleading lenders and purchasers in the new state.

(Footnotes omitted.) Continuing, the court said at page 860:

With the "fraud absent theft" cases, courts are in disagreement not only as to whether the law of the state issuing the last certificate will govern, but also as to whether Article Nine controls at all. A majority of the decisions maintain that the fraudulently procured clean certificate (that is, the *last* certificate) controls. The original secured party is consequently subordinated to local parties who have been defrauded.

(Footnote omitted.)

Thus, it is apparent that the question is not an easy one, and the courts are divided as to whether the "four month perfected" effect of section 9-103 should be absolute or whether a secured party can lose that protection and right when he makes it possible for the owner to secure a local title clear of liens which is then used to ensnare an unwary purchaser.

Three cases cast some light on the problem. An excellent analysis of *First Nat'l Bank v. Stamper,* 93 N.J. Super. 150, 225 A.2d 162 (1966) is found in R. Henson, *Handbook on Secured Transactions Under the Uniform Commercial Code* § 9-7 at 227 (1973):

These problems can be examined in the context of what is known as the *Stamper* case. In New York a car dealer sold a used Thunderbird to Stamper and assigned

the purchase money security interest to plaintiff bank. Stamper was then a resident of New York, and the security interest was perfected by a New York filing but not by certificate of title notation because New York then had no statute requiring or permitting this. Stamper procured a New York certificate of registration. Not long thereafter Stamper began residing temporarily and then permanently in New Jersey, and he applied for and received, without plaintiff's knowledge or consent, a New Jersey certificate of ownership which showed him as the owner without noting plaintiff's reservation of title, although there was a "Z" at the end of the number on the certificate to show that the vehicle had previously been registered in another state. Three months and one week after purchasing the car in New York, Stamper sold the car in New Jersey to Sharp, apparently an innocent consumer, who received a clean New Jersey certificate of ownership. Shortly thereafter Sharp sold the car to Fitzgerald whose New Jersey certificate showed a lienholder, but not the New York bank, of course. Since Stamper continued making payments for some months after he left New York, it took the bank eleven months after his move to find out that he had moved to New Jersey; shortly thereafter the bank learned that Fitzgerald had the car, and it took another year to find Stamper. Fitzgerald moved "to and fro," according to the court, "between New Jersey, Florida, and now Pennsylvania." The plaintiff bank could not find Stamper and sued Sharp for conversion. Plaintiff bank recovered judgment for the value of the car at the time it was purchased by Sharp.

(Footnote omitted.)

The decision is criticized by the text writer on the basis that it places the innocent purchaser who bought in reliance on the clean certificate of ownership in a position of acting at his peril if he purchases within the 4-month period. The result will be to blight any transaction with a title certificated vehicle for the 4-month period following the issuance of the certificate. Such may be the price of uniformity and safety.

In the case of *Phil Phillips Ford, Inc. v. St. Paul Fire & Marine Ins. Co.*, 454 S.W.2d 465 (Tex. Civ. App. 1970), an automobile dealer brought suit against a secured party for

damages the dealer claimed resulted from the secured party's conversion of the automobile. Texas had adopted the UCC in 1965 and its section 9-103 likewise stated that if personal property subject to a security interest was brought into Texas, the validity of the security in Texas was to be determined by the law of the jurisdiction where the property was when the security interest attached. A security interest had been perfected in Oklahoma before the automobile was brought into Texas without the knowledge or consent of the owner and sold to the automobile dealer within the 4-month period. The court held that under the provisions of section 9-103 (3), the purchaser took the vehicle subject to the outstanding interest of the secured party and that the secured party could repossess. This holding was distinguished on review by the pronouncement of the Texas Supreme Court in *Phil Phillips Ford, Inc. v. St. Paul Fire & Marine Ins. Co.,* 465 S.W.2d 933, 42 A.L.R.3d 1158 (Tex. 1971), which stated that when an automobile is covered by a certificate of title issued by *Texas,* whether a lien is perfected and enforceable against an innocent purchaser is to be determined by *Texas* law and under *Texas* law, a lien may not be enforced against an innocent purchaser unless it is noted on the certificate of title. The court found that since the owner did not sign the certificate at the time of the sale, which would have required the disclosure of the lien, the result reached by the lower court would be upheld.

*Churchill Motors, Inc. v. A.C. Lohman, Inc.,* 16 App. Div. 2d 560, 229 N.Y.S.2d 570 (1962), dealt with a security interest perfected in Rhode Island on an automobile sold in Pennsylvania within 4 months of when it was brought into Pennsylvania. The court held that the buyer of the vehicle from the New York seller who had purchased it in Pennsylvania did not acquire title superior to that of the Rhode Island secured party. An excellent analysis of section 9-103 is found at page 562 as follows:

As will be seen upon a reading of the quoted subsection, the draftsmen of the code decided that the condi-

tional vendor ought to try to keep track of the location of the property covered by the conditional sale agreement and, if he discovered that the property had been taken to another State, he ought to take reasonably prompt steps to give notice to the public of his interest in accordance with the law of that State. On the other hand, subsequent purchasers and lienors in the State to which the property had been taken would have to take the risk of there being an outstanding security interest in the State from which the property had come, if they purchased the property or acquired a lien upon it shortly after it had been brought into the State and before the vendor had had an opportunity to discover the facts and to perfect his security interest in accordance with the law of the State. A four-month period was chosen as a reasonable period within which the vendor ought to be able to locate the property and to perfect his security interest in the State to which the property had been taken.

The opinion of the court in *Churchill Motors, Inc.* continues at page 567:

the four-month period provided in subsection (3) of section 9-103 of the Uniform Commercial Code is not a grace period for filing; it is an absolute period of protection of the vendor's security interest designed to give him adequate time to make an investigation and to locate the property. If the vendor fails to file within the four month period, the protection of his security interest ceases upon the expiration of that period and his unperfected security interest is thereafter subject to being defeated in the same way in which any unperfected security interest may be defeated under the code. A subsequent purchaser for value without notice of the unperfected security interest would take a title superior to it (Uniform Commercial Code, §§ 9-301, 9-307, 1-201, subsection [9]). But a prior purchaser who had purchased during the four-month period of statutory protection is not retroactively given a superior title. He is not in the same position as a subsequent purchaser who acquired his interest after the expiration of the four-month period.

In *Seely v. First Bank & Trust*, 64 Misc. 2d 845, 315 N.Y.S.2d 374 (1970), the New York buyer of a truck brought suit against the Florida security holder for conver-

sion of the truck when the security holder repossessed the truck. The initial Florida title reflected the secured party's lien but the owner secured a New York title, and there was no reflection of the Florida lien by the filing of a financing statement with the local county clerk's office under New York law. Statements from the decision, as follows at page 847, are particularly apropos to the facts of this case:

> However, in this case, the bank not only was aware that DeForest intended to remove the truck to New York for business use here but gave written permission to register the truck in New York State. This practice was then accepted in New York.

> New York is a so-called "filing" State in which unsatisfied liens are perfected against an owner and the vehicle by filing the lien contract or a financing statement, usually in the county of the debtor's residence, and title is transferred by merely transferring the vehicle's license registration, which is the accepted indicia of ownership in New York. . . .

> . . .

> The common public policy in all jurisdictions is that both a secured interest holder and an innocent purchaser for value should be protected by notice from fraud. Underlying this is the further principle that all parties to a lien transaction (or a transaction possibly involving a lien) have a responsibility in relation to it for their own protection and that of others possibly concerned by giving an *effective* notice of an out-of-State lien in known multi-State transactions. . . .

> . . .

> Obviously the difference in title forms and lien procedures between Florida and New York provided the stage. The bank's permission to register the truck in New York without filing against it set that stage for the fraudulent performance resulting in the damages of which plaintiff now complains. The question is upon which of the parties to this lawsuit should the loss fall.

The 4-month period had long been exceeded, the absolute protection of section 9-103(3) was not mentioned, and the good faith purchaser without notice was granted judgment.

Finally, in *Doenges-Glass, Inc. v. General Motors Acceptance Corp.*, 175 Colo. 518, 488 P.2d 879 (1971), the court

held that a purchaser in Colorado had a reasonable duty to ascertain if a foreign lien existed upon a motor vehicle from a noncertificate of title state. In the opinion, the court noted that if the purchaser had checked the county shown on the New York registration certificate, it would have acted reasonably and should prevail over lienholders not disclosed by such a search. The court concluded at page 882:

> Hence, GMAC must prevail, especially since the search by Doenges-Glass . . . would have disclosed the GMAC lien.

The opinion, unfortunately, does not discuss the effect of the 4-month grace period; and under the facts of the present case, the interest of the First State Bank of Abilene would not have been disclosed by a search of New York filings in any event. *See also* 4 R. Anderson, *Uniform Commercial Code* §§ 9-103:19, 9-103:22 (2d ed. 1971).

This longer than desirable discussion has been necessary to reflect the problem and the trend of the holdings. It is unfortunate that the drafters of the code gave the states the option to choose between the mandatory reflection of liens upon a certificate of title or to record liens with local recorders. It appears that uniformity and interlocking comity between the states will be achieved only if all the states are title states.

Historically, the secured creditor was given a "reasonable" time within which to perfect his lien against property removed to another state. The UCC eliminated the controversy over what was "reasonable" and whether the time period ran from the time of discovery of the removal or from the actual time when the goods were brought into the new state. Now the period is settled at 4 months from the time the goods are brought into the state; and, if the prior understanding of the law is to have any effect, the protection of the perfection of the lien in the state where the security interest attached must be absolute. Further, the statute refers to the state wherein the security interest was

perfected inferring that subsequent actions affecting the security interest are without impact. The statute does not specifically recognize the possibility of obtaining an intervening title free and clear of the lien interest perfected in a preceding state. Further, the indication is that even though the secured party by his credulity has made it possible for the owner to fraudulently achieve a clear title in another state and then a clear certificate of title in yet a third state, the risk is to be borne by the party who relied on a clear title during the 4-month period. Though this result is a harsh one on those dealing in reliance on the clear title, the message of the statute and many cases construing it is that there is no right to rely upon such a title until it has passed from its 4-month infancy into a ripened maturity. The intent and spirit of the UCC is to achieve predictability and uniformity. These interests must weigh heavier in the balance than the regretable result upon the buyer who in good faith felt he could rely upon the clear Washington certificate of title.